Filed 5/4/22  P. v. Green CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT WILLIE GREEN,<br><br>Defendant and Appellant. | C092520<br><br>(Super. Ct. No. 19FE021539) |

Defendant Robert Willie Green appeals from a conviction for domestic violence committed against Chantel Doe, his former cohabitant.[1]

The jury found defendant not guilty of felony assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[2] but guilty of the lesser included offense of simple assault, a misdemeanor (count one, § 240), and guilty of felony infliction of corporal injury on a

---

[1]  As did the trial court, we refer to the victim by her first name and "Doe" in place of her last name.  (Cal. Rules of Court, rule 8.90(b)(4).)

[2]  All undesignated statutory references are to the Penal Code.

1

former cohabitant (count two, § 273.5, subds. (a), (b)(2)), felony battery causing serious bodily injury (count three, § 243, subd. (d)), and misdemeanor violation of a protective order (count four, § 166, subd. (c)(1)). The prosecution alleged four prior convictions against defendant. In a bench trial, the court struck two prior convictions and the prosecution dismissed another. The court sentenced defendant to eight years, consisting of the upper term of four years on count two, doubled to eight years because of the remaining strike prior. The court imposed and stayed sentences on counts one, three and four under section 654.

Defendant contends: (1) the court improperly removed him temporarily from trial proceedings for disruptive behavior and failed to inform him he could return when he could conduct himself properly; (2) his counsel was ineffective for failing to object to testimony by a domestic violence expert that victims commonly recant; (3) the court failed to give a complete instruction on "serious bodily injury" with illustrative examples, even when the jury asked for clarification as to whether a swollen eye was a serious bodily injury; and (4) the court erred in limiting defendant's pretrial custody credits to 15 percent under section 2933.1 because he was not convicted of a "violent felony" under section 667.5, subdivision (c). With the exception of the court's application of section 2933.1, we reject defendant's contentions.

In supplemental briefing, defendant contends that this case should be remanded for resentencing as a result of the legislative changes made by Senate Bill No. 567 (2021-2022 Reg. Sess.) and Assembly Bill No. 518 (2021-2022 Reg. Sess.). We agree and will remand for resentencing.

FACTUAL BACKGROUND

I.      Trial

A.      Prosecution's case

Defendant was Chantel Doe's ex-boyfriend. Doe testified at trial that she still loved defendant and wanted the charges against him dropped.

2

Doe lived with defendant at one point at his mother's house. On Thanksgiving, November 28, 2019, they were dating but not living together. Doe was visiting her parents at their house, a block down the street from defendant's mother's house.

Doe went to defendant's mother's house on the night of Thanksgiving 2019. Doe testified that defendant was upset with her because she was intoxicated and "doing stupid things that he didn't like." The next morning Doe went to the hospital. She had an injury to her eye. She couldn't see out of one eye. Doe testified she didn't know how she got her injuries.

Doe admitted that, at the preliminary hearing, she said she got her injuries from an altercation with a woman at Applebee's. Doe said she only knew the woman's first name, Angel, and could not provide any physical description of her. Doe admitted that she did not know at the time of the preliminary hearing that Applebee's was closed on Thanksgiving Day 2019. Doe admitted her injuries were not caused by a woman at Applebee's.

Doe testified that her injuries were caused by another ex-boyfriend, Marcus. She didn't know his full name. They were in a relationship for three or four days before Thanksgiving. Doe met him on Facebook. The first two days with Marcus were good, but then he asked her to do some things she wasn't willing to do. Doe could not remember what Marcus did to her but she was getting hit and "beat-up." Doe did not tell the police that Marcus had caused her injuries.

Doe testified that she called defendant and he told her to come to his mother's house. When Doe went there, defendant was upset and disappointed because of how she looked. Doe was belligerent, intoxicated and high. Defendant asked her why she would go with another guy and do this to herself. He told her to go to her parent's house. Doe testified that defendant did not put his hands on her and she did not touch him.

Doe testified that when she spoke to police at the hospital the next day she was "still belligerent," "on cloud nine," and "delusional."

3

A video recording of Doe's interview by Sacramento Police Officer Edwin Asahara at the hospital was played for the jury.[3]

In the interview, Doe stated that defendant had assaulted her the night before. Defendant texted Doe that he wanted to see her because it was Thanksgiving. Defendant picked her up from her house at around 7:30 p.m. and drove her one block down the street to his house. A friend of defendant's was driving and dropped them off at defendant's house. In his bedroom, defendant grabbed Doe's phone and went through it. Defendant threw her phone because "maybe he seen somethin' in my phone." Defendant put his hands on her. He was choking Doe as she walked to the door. In the kitchen, defendant hit her with a pan. Doe hit the ground and woke up to find defendant's foot in her eye. He kept kicking her in the ribs and side. She curled up in a ball. Defendant pulled off the weave in her hair and dragged her into the garage. Defendant opened the sliding garage door and Doe took off running. Doe said she had a restraining order against defendant and wanted to press charges against him.

When Officer Asahara interviewed Doe at the Kaiser South Sacramento hospital on November 29, 2019, she had purple bruises around both eyes. Doe complained of pain in her face, head and other parts of her body.

An order issued in December 2018 protected Doe from defendant, restraining him from threatening, harassing or striking Doe.[4] The protective order was in force on Thanksgiving 2019.

On November 29, 2019, Dr. Dana Rygg, a doctor in the emergency department at the Kaiser South Sacramento hospital, saw Doe in a private room. Doe complained of

---

[3] The transcript of the video recording was not admitted as evidence but was included in the clerk's transcript. However, the parties cite it as an accurate transcription of the recorded interview. (See *People v. Thiessen* (2012) 202 Cal.App.4th 1397, 1402, fn. 3.)

[4] Doe testified she told the officer the restraining order was mutual, that defendant and Doe were not supposed to see each other but Doe was still seeing defendant.

headache, facial swelling, bruising on her face, arm pain, and abrasions on her right arm. Doe said her voice was hoarse because she had been strangled. Doe said she was not able to see out of her left eye, which was swollen shut. Doe said her hand was swollen.

Doe said her ex-boyfriend caused her injuries. She said he had punched and kicked her multiple times, hit her in the head with a kitchen pan, and strangled her. She lost consciousness. Doe said this happened at her ex-boyfriend's residence. Rygg observed significant swelling to Doe's left eye and eyelid, bruising around both eyes, abrasions on her face, contusions on the right side of her face, multiple abrasions and scratches on her right arm, abrasions on her right knee, swelling of the right hand, and tenderness on her larynx.

Doe reported that she had been broken up with her ex-boyfriend for six months. Doe did not feel safe going home. Doe "was tearful but very open and motivated to speak with law enforcement and change things for herself." Doe did not appear to be under the influence of drugs or alcohol. Doe's blood was drawn but not tested for drugs or alcohol because there was no indication she was intoxicated.

A Sacramento Police forensic investigator, Maile Reason, took photographs of Doe's injuries on November 29, 2019, at the Kaiser South Sacramento hospital. The photographs showed injuries to her face, neck, right shoulder, right arm, left arm, right hand, knees, and right ankle.

Doe testified at trial that she was still intoxicated when she spoke to the police officer in the video recording. Doe said she made up the story about defendant because he didn't rescue her from the other man. Doe agreed that she told a hospital worker that her ex-boyfriend hit her in the back of the head with a pan, choked her, and she passed out. Doe agreed she told the hospital worker that she woke with defendant's foot above her head, and that he kicked her and dragged her on the floor by her arm. Doe testified she lied to the hospital worker because she was mad at her boyfriend. Doe wanted

defendant to beat up the other guy but he wouldn't do it, so Doe said she would "fuck your life up."

On cross-examination, Doe testified that she and defendant were considering breaking up when she responded to Marcus, who had been sending her messages on Facebook. When Doe got in the car with him, he did not look like the person she saw on Facebook. The first time he picked her up they had a couple of conversations and drinks and did "some wrong things." The second time he tried to take her out of the city and make her do things she didn't want to do. Doe told him to drop her off at her house.

Doe testified that the next day at the hospital her mother and father were with her during the interview. Her parents did not like defendant and made up the story for Doe to tell police. The interview took place in a hallway with people coming and going. Doe was still high from Ecstasy, marijuana and liquor that she got from Marcus.

Doe testified that what she told the officer was not correct. On Thanksgiving 2019, Doe walked to defendant's house and did not go inside. Doe called defendant before she walked over and told him she had gotten beaten. Defendant wanted to see what she looked like. Doe was extremely drunk. She told defendant that Marcus was responsible for the injury to her face. Doe was there 10 or 15 minutes and walked back home.

Doe denied that defendant assaulted her in Santa Cruz in 2017. The parties stipulated that defendant was convicted of assault on a cohabitant in Santa Cruz County in November 2018. In 2017, Santa Cruz Police Officer Michael Hedly was dispatched in response to a report of a domestic disturbance in Santa Cruz, where he made contact with defendant and a person named Chantel. Chantel had scratches on her neck. Chantel said that she and defendant were arguing verbally, but nothing physical occurred. She denied that defendant touched her in any way. Santa Cruz Police Officer Ron Inouye took a statement from Doe. She appeared nervous, scared and "possibly intimidated." Doe

6

avoided eye contact with the officer and kept looking to the left at defendant, who was approximately 40 feet away.

On February 20, 2018, Rebecca Cody, a registered nurse at the Kaiser South Sacramento hospital, saw Doe in the emergency room. Doe said that her boyfriend lays his hands on her every morning and that Doe was "trying to get out of an old situation" that she didn't feel safe going back to. When Doe told Cody this information, Cody was required to report it to the police. Cody told Doe that the police would be notified because Cody was a mandated reporter. Per hospital protocol, Cody had a social worker file a report with the police. Doe left the facility before the police could interview her. On cross-examination, Cody confirmed that Doe came into the hospital with a urinary tract infection and Cody saw no visible injuries to Doe.

On February 20, 2018, Wayne Cottle, a social worker, saw Doe in the emergency department of the Kaiser South Sacramento hospital. Doe told him that defendant beat her daily and that she had black eyes she covered up with makeup. On cross-examination, Cottle confirmed that he told a police officer that he could not see any visible injuries on Doe.

David Cropp testified as an expert regarding domestic violence, including why victims stay in abusive relationships and recant reports of abuse. Cropp explained the three phases in the cycle of domestic violence: the honeymoon phase, marked by lack of tension and a coequal, respectful relationship; the tension building phase, where the victim senses nonverbal cues of tension, tries to appease the abuser and describes "walking on eggshells"; and the acute episode phase, which includes a "barrage of insults," is often physical, and is highly emotionally charged. The cycle is not present in every violent intimate partner relationship but occurs in most.

Victims may reach out to the police at any phase but typically reach out during or shortly after the acute episode phase. Victims are afraid and want the abuse to stop.

Cropp testified: "[I]t's very common, in fact, more common than not for victims to later, after they have spoken with the police, to change their mind, to change their story, to claim that they lied to the police, or police got it wrong. And they, most of the time, ask for the prosecution not to occur or the investigation not to occur."

The number one reason for this is that victims feel bad for their intimate partners. Victims have an emotional attachment to their partners and it is very difficult for victims when they see their partners arrested or prosecuted. Many times abusers blame victims for their predicament and appeal to the victim's sympathy. Victims do not want to disrupt the family or children. Victims fear what may happen when an abuser is arrested. They might fear being on their own, or, if they have been out of the job market, about supporting themselves or their children.

Victims also might fear retaliation. Violence does not stop when an abuser is arrested. After arrest abusers may threaten victims through others or in person through social media. Stalking behavior may increase. Most victims killed or almost killed by intimate partners have been stalked.

Victims who have cycled into the honeymoon phase may not see their abusers as abusers. Victims are hopeful for a normal future. For these same reasons, most victims will return to their abusers. Leaving abuse is a process. It takes many attempts before victims develop the hope and courage to leave.

For these reasons, victims also may not report abuse. Calling the police does not mean the abuse will stop and may exacerbate the situation. Many victims do not have confidence in the criminal justice system. Victims want the abuse to stop but they don't want the abuser arrested or put in jail.

Cropp confirmed that he had not spoken to the victim or any witnesses in the case, including police officers.

On cross-examination, Cropp testified that if a victim recanted, this might actually support his opinion that domestic violence occurred. Cropp admitted that there can be

8

false reports to police of domestic violence. He testified: "I have spoken with women, women who claimed to have been victims of domestic violence who told me they lied. And based on their statement, I believe they did lie. It's a very small percentage. There's only been actually two cases that come to mind out of thousands that I have reviewed. [¶] But it's a form of retaliation. They, they -- the husband or boyfriend maybe wants to leave the relationship, or is, is -- doesn't want to be involved in the relationship any more. And so they call the police, and have them arrested by lying to them about the abuse in order -- as a form of retaliation."

### B. Defense's case

Robert Green, Sr., is defendant's father. On Thanksgiving 2019, Green, Sr., was at home with defendant; Green, Sr.'s wife had gone shopping with the children. Green, Sr., was in bed and he heard a "ruckus" outside. He heard a loud female voice. Somebody was yelling and sounded belligerent and drunk. He recognized the voice as defendant's girlfriend. Green, Sr., heard banging on the front door. Green, Sr., and defendant went to the door and opened it. Green, Sr., saw defendant's girlfriend. She was "[m]oving around, acting silly, kind of stupid." She appeared under the influence. She had on a wig that was hanging off sideways. Defendant told her she had to leave but she wouldn't. Green, Sr., told her she had to leave because she was making a lot of noise and he had neighbors who were quiet.

Doe kept coming to the front door, trying to get inside, so Green, Sr., and defendant blocked her, and defendant grabbed her by the arm and guided her to the street. She fell on a line of bricks bordering the grass and got back up. She was talking crazy about the fall. Defendant told her he did not cause her to fall. She was trying to get in the garage but she couldn't lift up the door. She left on foot, going down the street, yelling and talking about how she wanted her phone.

9

Green, Sr., testified that defendant's girlfriend never made it into the house and defendant did not hit her with a frying pan, drag her through the house, or assault her in the garage.

## DISCUSSION

### I

*Removal of Defendant from the Courtroom*

Defendant contends that the trial judge removed him from the courtroom without adequate cause and never informed defendant that he could return when he could conduct himself with proper decorum.

Defendant's removal stemmed from his intention to disclose to the jury portions of Doe's interview by Officer Asahara that the trial court had ruled inadmissible. Defense counsel proposed, and the prosecutor agreed to, edits to the recording and transcript that included references to a gun, that defendant had been in and out of jail, and security cameras at defendant's house. The court further ruled that the prosecutor could not ask Doe about the cameras at defendant's house.

The first day of trial defendant told the court he did not agree to any deletions. He said he did not have anything to hide and was asking that everything be heard. Defendant explained that, if he was convicted, he did not want to feel it was because everything was not heard. The court said it would not "get in the middle of" disagreements between defendant and defense counsel. Defendant asked that the record reflect that he did not agree to an edited version of the interview being presented. The court assured defendant that his disagreement would be noted in the record. The prosecutor asked the court to make a statement on the record of the reasons for the deletions. The court stated that any mention of a gun would be highly prejudicial, noting there was no gun allegation against defendant.

At a break, the court again addressed defendant about his desire to address the jury about a gun. The court ordered defendant not to have any outbursts in court. Defendant

10

responded that he was not worried about the gun but rather "contradictions that are proved somewhat of my innocence . . . ." Defendant asserted that if he did not agree to the interview evidence with "a lot of stuff taken out," it should not be done. Defendant suggested he might "get kicked out of the courtroom" for addressing the jury. The court said that defendant needed to be present to assist defense counsel and admonished defendant again not to have any outbursts. The court suggested that defendant talk to his lawyer about taking the stand. Defendant responded that defense counsel was not saying what defendant wanted. The discussion concluded with defendant stating, "I will do it, then so be it," and the court responding, "You do it, then you are out."

When the recording was about to be played to the jury, the court was explaining that the recording had stops and starts because of "verbiage" "considered not relevant," when defendant said, "For the record, this is" "[d]eleted out," and "[s]ome was deleted out." The court had the jury removed and said, "Mr. Green, I told you this morning that if you defied my order and spoke out in front of the jury, that you would be, basically, telling me you don't want to be here, and you don't want to take part in your trial." Another discussion ensued between the court and defendant, this time about whether defendant was making a choice not to attend the trial. The court concluded, "Okay, Mr. Green, I will find that you have voluntarily absented yourself during this trial," which elicited defendant's response, "I didn't volunteer anything." Defendant was taken out of the courtroom.

Defense counsel asked for time to consult regarding whether to ask for a mistrial. The court said, "No. [¶] It's not a mistrial. He voluntarily absented himself from the trial." The court indicated willingness to bring defendant back the next morning. When defense counsel asked if the court was going to advise the jury why defendant was not present, the court asked if counsel would like the jury informed that defendant decided not to be present that afternoon, a suggestion counsel rejected.

11

At the end of the day, defendant was brought back into the courtroom. The trial judge told defendant it was important for him to be present during his trial and asked if he wanted to do so for the remainder of the trial, which would mean no outbursts while attorneys were talking or witnesses testifying. The court reiterated that defendant could testify but that would not mean he could say whatever he wanted to say. Asked if he wanted to be present for the remainder of the trial, defendant answered, "Yes," without further elaboration.

The court, defense counsel and defendant had one more discussion regarding his absence from trial. After defendant confirmed that he waived his right to testify, the court asked if defendant wanted the jury to be informed that he was not absent due to illness, to allay any concern about "this virus," i.e., COVID-19. Defendant said he preferred that the court not say anything.

In *Illinois v. Allen* (1970) 397 U.S. 337 (*Allen*), the United States Supreme Court said " 'that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.' " (*People v. Johnson* (2018) 6 Cal.5th 541, 557 (*Johnson I*) , quoting *Allen*, at p. 343.)

"[A]ppellate courts must give considerable deference to the trial court's judgment as to when disruption has occurred or may be reasonably anticipated." (*People v. Welch* (1999) 20 Cal.4th 701, 773; *Allen, supra*, 397 U.S. at p. 343 ["trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case"].)

Defendant contends that his statements to the jury were not so disruptive that the trial could not be carried on with him in the courtroom. Defendant told the trial court that he was going to address the jury about "contradictions" in the deletions from the interview recording and transcript that might prove his innocence. Defendant attempted

12

to do so when the recording was about to be played and a transcript handed out to jurors. Defendant contends that this conduct does not rise to the level of disruptive behavior found in other cases. For example, defendant cites *Johnson I*, in which the defendant violently attacked defense counsel after "regular, repeated, and vulgar disparagement of his attorney, including cursing and spitting, as well as numerous epithets directed at the court and other outbursts." (*Johnson I, supra*, 6 Cal.5th at p. 561.)

We disagree that only misconduct of this severity warrants removal. In *Ramirez v. State* (Tex.Ct.App. 2002) 76 S.W.3d 121 (*Ramirez*), a Texas appellate court examined the behavior that defendant exhibited here. The defendant in *Ramirez* testified in a trial for the murder of the son of his cohabitant Maria. (*Id.* at p. 124.) When his testimony concluded, the trial court asked him to take a seat next to his lawyer. (*Id.* at p. 128.) Instead, defendant asked, "What about the child abuse cases on Maria, her CPS [Child Protective Services] and day care – [¶] . . . [¶] . . . and police calls. What about all that? I think the jury should know. She's the one with the child abuse complaint." (*Id.* at pp. 128-129.) The court ordered the jury taken out. (*Ibid.*) The court told the defendant he could stay if he could behave or he would be taken to a holding cell where he could not be disruptive. (*Id.* at p. 129.) The defendant said: "I was not being disruptive. The jury should know --" (*Ibid.*)[5]

The defendant claimed he was denied his constitutional right to be present at trial when the trial court ordered him removed. (*Ramirez, supra*, 76 S.W.3d at p. 128.)

---

[5] In *Ramirez*, after the defendant was removed, defense counsel agreed to the trial court's suggestion that the record would reflect that the defendant voluntarily absented himself from the trial. (*Ramirez, supra*, 76 S.W.3d at p. 129.) Here, the trial court similarly "deem[ed]" defendant's removal to be voluntary, a conclusion that defendant expressly disputed. It is clear that in neither case was the defendant's absence voluntary. Thus, contrary to defendant's claim, his removal did not require a written waiver, as mandated by sections 977, subdivision (b)(1), and 1043, subdivision (d), for a defendant's voluntary absence from trial.

Applying *Allen*, the court in *Ramirez* found that "appellant insisted on 'poisoning' the jury by attempting to inject alleged facts into the proceeding that were not in evidence. The trial judge had a duty to protect the integrity of the trial. Despite being warned that he would be expelled from the courtroom if his behavior continued, appellant chose to insist his antics were not disruptive and failed to assure the trial court that he would remain quiet. As the trial court lacked reason to believe appellant's misbehavior would cease, appellant's expulsion was not unconstitutionally improper." (*Id.* at pp. 129-130; see also *U.S. v. Patterson* (7th Cir. 2010) 397 Fed.Appx. 209, 212, 213 [under *Allen*, the trial court had no duty to let the defendant back in the courtroom, given his disruptions after the court refused to let him represent himself, based on the court's concerns that the defendant "would seize the opportunity to disrupt the proceedings and blurt out inadmissible evidence"].)

The court in *Ramirez* acknowledged that the defendant's conduct was not of " 'an extreme and aggravated nature' " that justified expulsion in *Allen*. (*Ramirez, supra*, 76 S.W.3d at p. 131; *Allen, supra*, 397 U.S. at p. 340 [e.g., threatening the trial judge's life, tearing up defense counsel's file, and continually talking back to the judge].) However, we conclude that a defendant's expressed and undeterred desire and intention to convey directly to the jury facts and evidence that the court had ruled inadmissible cannot be addressed by any other method.

Notably, the Supreme Court in *Allen* proposed "at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." (*Allen, supra*, 397 U.S. at pp. 343-344.)

As to the first method, the court said, "even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort," noting "this technique is itself something of an affront to

14

the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." (*Allen, supra*, 397 U.S. at p. 344.)

Regarding the second method, defendant contends "a contempt citation likely would have been sufficient to head off any further interruptions." This is speculation belied by the fact that the trial court warned defendant repeatedly against making any outburst regarding deletions from the interview, finally informing defendant that he would be removed if he did so, and defendant responded that he would do it anyway, a promise that he fulfilled.

Moreover, as the Attorney General points out, the California Supreme Court has held that a claim that alternative measures should have been considered is "forfeited [where] defense counsel never asked the court to consider such measures." (*People v. Banks* (2014) 59 Cal.4th 1113, 1181 (*Banks*), disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 386.) Plus, even if the claim was not forfeited, the court in *Allen* observed that the contempt sanction has little deterrent effect where the defendant is facing a long prison sentence, and imprisoning a defendant for contempt and continuing the trial until the defendant agrees to behave may aid a defendant's strategy to prolong the trial "in the hope that adverse witnesses might be unavailable after a lapse of time." (*Allen, supra*, 397 U.S. at p. 345.) This latter concern is particularly apt where the victim, as here, did not want to testify against defendant in the first place.

Allowing defendant to remain in the courtroom when he was intent on telling the jury that there were deletions in the interview evidence posed a danger of undermining the entire proceeding. Juries are well aware that some information obtained during the investigation of a crime is not introduced as evidence based on restrictions imposed by the rules of evidence, which naturally gives rise to jurors' speculation as to what such information might be. If defendant persisted in telling the jurors they were not getting the whole story, which if they knew it would prove his claim of innocence, could result in a verdict not based on the evidence. Further, if the jury learned that Doe had referred to a

gun in the interview—a major concern prompting defense counsel's proposed deletions—even out of defendant's mouth, the prejudice occasioned thereby could be the basis of a defense appeal.  As in *Ramirez*, we conclude that the trial court had little choice but to remove defendant from the courtroom until he could provide reliable assurance that he would no longer address the jury with references to evidence the trial court had excluded.

Defendant also claims the trial court erred because it did not inform defendant that he could return to the trial as soon as he was willing to conduct himself properly.  (*Allen, supra*, 397 U.S. at p. 343 ["the right to be present can . . . be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings"]; § 1043, subd. (c).)  In *Banks*, the court rejected this argument, as well.  "Neither *Allen* nor section 1043 requires courts to affirmatively inquire whether a defendant wishes to return to trial and is willing to conduct himself properly.  It is defendant's duty to 'reclaim' his right to be present at trial by moving to do so" and by demonstrating the requisite willingness to behave.  (*Banks, supra*, 59 Cal.4th at p. 1181.)

Accordingly, defendant contends that he received ineffective assistance of counsel following his outburst and removal, because counsel should have "requested that [defendant] be made aware that he could return to his trial as soon as he was willing to compose himself and agree to refrain from any further interruptions," and also "explicitly stated her objection to such removal."

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness  [¶]  . . . under prevailing professional norms."  [Citations.]  Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."  [Citation.]  If the record "sheds no light on why counsel acted or failed to act in the

16

manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' [Citations.]" (*People v. Bell* (2019) 7 Cal.5th 70, 125-126 (*Bell*).)

We can perceive a tactical reason for not requesting the trial court to inform defendant he could return when he could conduct himself properly. Defendant's defiance was deep-seated, resulting in heated exchanges with the trial judge. Defendant also indicated his dissatisfaction with defense counsel who did not present the case as defendant said he wanted. Defense counsel could have reasonably believed that asking the trial court to tell defendant he could come back when he could calm down and keep silent would only inflame him. As it turned out, defendant was only absent for the afternoon before he confirmed for the court that he wanted to be present at trial even though he could not say what he wanted to say. Defense counsel could well determine that intervening before then to request that the trial court tell defendant he could return when he could behave would only exacerbate defendant's defiance and prolong his absence from the trial.

Defense counsel was also not deficient in failing to object to defendant's removal. The trial court quickly rejected defense counsel's request to consult someone regarding a motion for mistrial, declaring that defendant chose to absent himself from the trial. While counsel could have persisted with an objection that defendant should be allowed to remain, there can be no doubt that the trial court would not agree. "A decision not to pursue futile or frivolous motions does not make an attorney ineffective." (*Bell, supra*, 7 Cal.5th at p. 126.)

17

## II

*Expert Testimony That Recantation by Victims of Domestic Violence Is "Common"*

Defendant contends that he received ineffective assistance from defense counsel who failed to object to Cropp testifying regarding how common it is for victims of domestic violence to recant their initial report to police or, conversely, lie to the police in reporting domestic violence, testimony which defendant argues was irrelevant and highly prejudicial. Defendant also faults defense counsel for failing to object to Cropp's testimony that abusers' stalking behavior can lead to murder.

Defense counsel moved in limine to preclude Cropp from providing testimony that "quantifies the number of women who recant, lie, exaggerate, or are truthful in their reporting." The motion was based on *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*). In *Julian*, the court held the defendant was denied effective assistance when defense counsel failed to object to inadmissible expert testimony regarding child sexual abuse accommodation syndrome (CSAAS) that false allegations by children of abuse were low, ranging from 1 to 8 percent of cases. (*Id.* at pp. 885, 887-889.) Expert testimony on CSAAS is admissible to counter misconceptions about a victim's behavior (e.g., delayed reporting) as inconsistent with abuse, but is not admissible to prove the victim was sexually abused or is telling the truth. (*Id.* at p. 885.)

In *Julian*, the court held the expert's testimony regarding "92 to 99 percent probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Julian, supra*, 34 Cal.App.5th at p. 886.) Defense counsel had no justification for failing to object to such inadmissible evidence that improperly suggested the defendant was guilty "based on statistical probabilities that were irrelevant to this case." (*Id.* at p. 888; see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 568 (*Wilson*) [testimony that studies found 1 to 6 percent of child sex abuse allegations to be false was inadmissible]; *People v. Collins* (1968) 68 Cal.2d 319, 332 [" 'trial by mathematics' so distorted the role

18

of the jury and so disadvantaged counsel for the defense, as to constitute in itself a miscarriage of justice"].)

Here, at the hearing on the motion in limine, defense counsel argued that Cropp should "not quantify anything, to give a percentage or give a range." The prosecutor agreed to exclusion of testimony regarding percentages but argued that there was no prohibition on an expert testifying on "whether it's common or not." The prosecutor asked that Cropp "be allowed to use to use the word common or very common." The court ruled that "[t]here will be no quantification or percentages" but "definitely [Cropp] can testify as to common or not common." Defense counsel did not object to this testimony.

Cropp testified regarding "victims recanting" that "it's very common, in fact, more common than not for victims to later, after they have spoken with the police, to change their mind, to change their story, to claim that they lied to the police, or police got it wrong." On redirect examination, Cropp further testified that he "would predict in many cases that women actually recant. So this is not uncommon. Therefore, if I am working with somebody who has recanted, it might actually support my belief that domestic violence occurred." He also used the word "percentage" in answering defense counsel's question "in what portion of the relationship" do women lie to the police about abuse. "I can only speak from experience. Because I have spoken with women . . . who claimed to have been victims of domestic violence who told me they lied. And based on their statement, I believe they did lie. It's a very small percentage. There's only been actually two cases that come to mind out of the thousands that I have reviewed."

"The decision whether to object to inadmissible evidence is a tactical one and is accorded substantial deference on appeal. [Citation.] ' "[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings." ' [Citation.] 'An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel.'

19

[Citations.] 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' [Citations.]" (*People v. Campbell* (2020) 51 Cal.App.5th 463, 504-505.)

Defendant's argument is that "excluding numbers, but not other forms of quantification" is still error under *Julian*. Defendant therefore contends that "[b]ecause defense counsel failed to object to the usage of improper quantification terms other than numbers, and such testimony went to the heart of the issues presented, defendant received prejudicially ineffective assistance." We disagree.

Expert testimony using the term "common" has been admitted in California courts to describe victim recantation in child sexual abuse and domestic violence cases. (See, e.g., *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1215 [prosecution offered expert testimony that " '[i]t is very common' for a woman who has decided to reunite with her batterer to recant and falsify information in order to justify her decision to stay with the batterer"]; *People v. Housley* (1992) 6 Cal.App.4th 947, 952 [expert testified "it is very common for victims of [child sexual] abuse to recant the story after first making a report because they may not be believed, or may be removed from the home, or may fear the offender will suffer negative consequences from the reported abuse"]; see also *People v. Munch* (2020) 52 Cal.App.5th 464, 471 ["Recantation is a well-established common behavior of child sexual abuse victims"].)

Defendant cites the recent case of *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*), where the court held that it was error to allow a CSAAS expert, Dr. Blake Carmichael, to testify that it is " 'rare' " for children to make false allegations of sexual abuse. (*Id.* at p. 166.) In *Lapenias*, a juror asked the question, " 'Is it common for children to make up a story that abuse occurred, when, in fact it did not?' " (*Id.* at p. 177.) Carmichael responded over a defense objection: " 'No, that's rare. There's research that talks about false allegations, and what I've been talking about is studies and

20

experience with kids who we know have been sexually abused.  Depending on the nature of the research, if you are looking at custody issues, rates of false allegations are higher, and those are typically advanced by the parent, not the child.  So again, it's rare for kids to make a false claim of sexual abuse, even though those authors that talk about suggestibility and those kinds of concerns have written that most claims of sexual abuse are true.  So it's not a common thing for kids to fabricate such a story.' " (*Ibid*.)  After jurors were excused during a break, defense counsel renewed the objection, which the trial court overruled.  (*Id.* at pp. 177-178.)

The appellate court in *Lapenias* said this "testimony—by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty.  [Citation.]  Further, applying *Julian* and *Wilson*, we find [the expert witness's] answer went considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed reporting).  Rather, the juror's question—and Carmichael's response—' "addressed whether children who claimed to be sexually assaulted lie.  [The] testimony did not aid, but supplanted, the jury in its decision on whether" ' Doe's testimony was credible.  [Citation.]" (*Lapenias, supra*, 67 Cal.App.5th at p. 179.)

The *Lapenias* court rejected the Attorney General's argument that *Julian* and *Wilson* held only that a CSAAS expert " 'should not testify about the *statistical frequency* of false accusations of child molestation.' " (*Lapenias, supra*, 67 Cal.App.5th at p. 179.)  The court agreed with the defendant that " 'there is no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word "rare."  The problem with both assertions is that [the] expert is vouching for the veracity of the' alleged victims." (*Id.* at pp. 179-180.)

21

Cropp did not use the word "rare." The CSAAS expert who testified in *Julian*, on the other hand, used the word "rare" multiple times to describe the frequency of false allegations. (*Julian, supra*, 34 Cal.App.5th at p. 883 [" '*very infrequent, or rare*' "; " 'false reports of sexual abuse of children are rather rare' "].) He also referred to studies as supporting the claim that false reports of sexual abuse by children are "rare," as did Carmichael in *Lapenias*. (*Julian*, at p. 883; *Lapenias, supra*, 67 Cal.App.5th at p. 177.)

We conclude Cropp did not exceed the scope of expert testimony on domestic violence. Using the word "common," he testified that recantation is a typical or "common" behavior for victims of intimate partner battering. The CSAAS expert Carmichael in *Lapenias* also testified without objection that "delayed or unconvincing disclosure is very common" for child sexual abuse victims. (*Lapenias, supra*, 67 Cal.App.5th at p. 169.) Admittedly, Carmichael, in his response to the juror's question, used the terms "rare" and "common" somewhat interchangeably. (*Id.* at p. 177.) But the appellate court in *Lapenias* focused specifically on the term "rare" as going beyond permissible expert testimony on CSAAS. Cropp confined his testimony to "common" behaviors of abuse victims, consistent with *Morgan*, *Housley* and *Munch*.

Further, Cropp's testimony using the term "percentage" turned out to not actually state a percentage but rather his personal experience of two cases in which women admitted they lied about domestic violence. In *Wilson*, the court found that the defendant was not prejudiced by an expert's statistical evidence, in part because the expert stated that "he himself had come across two cases in which he believed a child he was treating was making a false allegation of sexual abuse." (*Wilson, supra*, 33 Cal.App.5th at p. 572.) Such testimony tended to mitigate the prejudice from inadmissible statistical probability evidence. The testimony on cross-examination in *Wilson* was similar to what defense counsel elicited from Cropp, i.e., evidence from the expert's own experience that some women claiming abuse lie. Indeed, Cropp testified: "I know that comes as a big shock, but people do lie to the police."

The other testimony by Cropp that defendant asserts defense counsel should have objected to involved an abuser's behavior when a victim leaves or is arrested. Cropp testified: "Just because a victim leaves and the . . . abuser is arrested doesn't mean the violence is going to be stopped. It's been well documented that abusers will . . . may or can threaten victims even after they have been arrested either through others, or through social media, or in person. [¶] It's also important to recognize that this is when we see stalking behavior increase. Without quoting percentages, I would say that most women who have been killed or almost killed by their intimate partners have been previously stalked by their intimate partner."

Defendant argues: "This was totally irrelevant to the facts of this case and only worked to stoke fear in the minds of the jurors. There was no evidence in the case that [defendant] had continued to try and contact Doe after his arrest or that he had engaged in stalking." However, Cropp never stated that his general testimony on domestic violence was relevant to the circumstances of the present case. To the contrary, he confirmed in response to questions from both the prosecutor and defense counsel that, he had never spoken to the parties, could not opine on the specifics of the case on trial, and was only speaking generally.

"[E]xpert testimony on domestic violence may include general descriptions of abuser behavior in order to 'explain the victim's actions in light of the abusive conduct.' " (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 903, quoting *People v. Gadlin* (2000) 78 Cal.App.4th 587, 595 (*Gadlin*).) Such testimony need not be immediately relevant to the circumstances at the time of trial. In *Gadlin*, the court said expert testimony on intimate partner battering, which "speaks directly to both recantation and reunion by a domestic abuse victim," was relevant even when the victim was not recanting but cooperating with the police at the time of trial. (*Gadlin*, at p. 594.) The testimony was relevant to the victim's state of mind and credibility at the time of the charged incident. (*Ibid.*) Here, the evidence was relevant to Doe's fearful state of mind,

not after defendant's arrest, but in her continuing to see defendant after she was no longer living with him, even though Doe told a doctor and nurse at the Kaiser South Sacramento hospital in February 2018 that defendant beat her every day and defendant was convicted of assaulting her in Santa Cruz.

Moreover, expert testimony that "suggests hypothetical abuse that is worse than the case at trial, it may even work to the defendant's advantage." (*Gadlin, supra*, 78 Cal.App.4th at p. 595.) Hearing Cropp testify to abuse leading to stalking and murder, the jury could conclude that defendant was less culpable than other alleged abusers.

Finally, to the extent that this testimony was objectionable because it suggested conduct on defendant's part of which there was no evidence, it was brief and came at the end of Cropp's extended general explanation of the various reasons why victims recant. Competent counsel could have made the tactical decision not to object because an objection would highlight the testimony and make it seem more significant. (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1076 ["competent counsel could rationally conclude that it would be counterproductive" to request a limiting instruction "highlighting expert testimony" on CSAAS].)

We find that defense counsel did not render constitutionally ineffective assistance in failing to object to the challenged testimony by Cropp.

III

*Jury Instruction on Serious Bodily Injury*

Defendant contends the trial court erred in giving the jury CALCRIM No. 925. The model instruction states in relevant part: "[A *serious bodily injury* means a serious impairment of physical condition. Such an injury may include [, but is not limited to]: (loss of consciousness/ concussion/ bone fracture/ protracted loss or impairment of function of any bodily member or organ/ a wound requiring extensive suturing/ [and] serious disfigurement).]" (CALCRIM No. 925.)

24

The court instructed the jury: "A serious bodily injury means a serious impairment of physical condition. Such an injury may include, but is not limited to: loss of consciousness, concussion."

In the course of deliberations, the jury sent a request for "Clarification of 'a serious bodily impairment' as it relates to the 'serious bodily injury' definition. [¶] Does a swollen eye or not being able to see out of an eye meet the definition of a serious impairment?"

The trial court responded: "Whether the alleged victim in this case suffered a serious impairment is a question of fact for the jury. Please review the definition of Serious Bodily Injury that was given to you in the Jury Instructions. [¶] It is up to you and you alone, as the trier of fact, to determine if a swollen eye or not being able to see out an eye meets the definition of serious impairment."

The jury found defendant guilty of battery with serious bodily injury.

Defendant contends that the trial court committed reversible error in omitting other examples than loss of consciousness/concussion in the initial version of CALCRIM No. 925 given and in response to the jury's request for clarification. Defendant argues "this instruction omits four specific examples of 'serious impairment' explicitly provided by the statute. These examples are highly responsive to the jury's inquiry about the injury to Doe's eye. . . . [T]he complete definition of serious bodily injury . . . would have helped the jury resolve their question . . . ." Defendant argues that the omitted examples "can be reasonably seen as more serious" than the swollen eye and inability to see that Doe suffered.

Defense counsel did not object to the trial court's jury instruction. Defendant maintains that this failure did not forfeit the issue on appeal because the claimed error affected his substantial rights. (See § 1259 ["The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; see also

25

*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [failure to object to legally incorrect jury instruction does not forfeit challenge to instruction on appeal].) Alternatively, defendant claims defense counsel rendered ineffective assistance in failing to request that the court provide jurors "with the complete definition of 'serious bodily injury' provided by statute."[6]

Assuming, without deciding, that defendant did not forfeit these issues, we find no error because CACRIM No. 925 as given was a correct statement of the law. The examples set forth in section 243, subdivision (f)(4)—and CALCRIM No. 925—"are merely illustrative" and do not define serious bodily injury. (*People v. Santana* (2013) 56 Cal.4th 999, 1010, citing *People v. Nava* (1989) 207 Cal.App.3d 1490, 1497-1498 (*Nava*).)

Moreover, the CALCRIM instruction guide advises that "[t]he instructions use brackets to provide optional choices that may be necessary or appropriate, depending on the individual circumstances of the case," and "both parentheses and brackets may appear in the same sentence to indicate options that arise depending on which necessary alternatives are selected . . . ." (Judicial Council of Cal., Criminal Jury Instn. (2021) p. xxiv.) The examples set forth in CALCRIM No. 925 are within both brackets and parentheses. Therefore, it was for the trial court to decide which examples, if any, were appropriate in the individual circumstances of the case.

The jury's request for clarification did not impose a duty or obligation on the trial court to list the illustrative examples for comparison purposes. The trial court properly stated (twice) that the essential question for the jury was whether Doe's injuries

---

[6] Section 243, subdivision (f)(4), defines " 'serious bodily injury' " as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement."

26

amounted to a "serious impairment." Moreover, the trial court could not answer the jury's question as framed. A trial court that informs jurors that a particular injury is a serious bodily injury within the meaning of the statute risks error. (*Nava, supra*, 207 Cal.App.3d at p. 1498.)

To be sure, " '[w]hen a jury asks a question after retiring for deliberation, "[Penal Code] [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." [Citation.] We review for an abuse of discretion any error under [Penal Code] section 1138.' [Citation.]" (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016 (*Lua*).)

"The trial court abuses its discretion if it refuses to offer any further instruction without first considering how it can best aid the jury. [Citation.] However, the trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete.' " (*Lua, supra*, 10 Cal.App.5th at p. 1017.)

The trial court did not abuse its discretion by referring jurors to the definition of serious bodily injury in the instruction as a serious impairment of physical condition. CALCRIM No. 925 was full and complete and there was no abuse of discretion in the trial court directing the jury to review that instruction. (*Lua, supra*, 10 Cal.App.5th at p. 1017.)

For the same reason, we reject defendant's contention that defense counsel rendered ineffective assistance in failing to request that the trial court include all the illustrative examples in CALCRIM No. 925, either initially or in response to the jury's request. The record is devoid of any discussion with counsel and the court regarding the

27

wording of CALCRIM No. 925 as given or the court's response to the jury's question. We can conceive that defense counsel did not object because the instruction was a full, complete and correct statement of the law. (*People v. Ochoa* (2011) 191 Cal.App.4th 664, 674, fn. 8 ["Defense counsel does render ineffective assistance by declining to raise meritless objections"].)

IV

*Credit Limitation Under Section 2933.1, Subdivision (c)*

Defendant contends that the trial court erred in limiting his worktime credit to 37 days, under section 2933.1, subdivisions (a) and (c), which restrict presentence worktime credit in county jail to 15 percent of actual custody, in this instance 15 percent of 253 days or 37 days. We agree.

Subdivision (a) of section 2933.1 provides that "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit . . . ." Subdivision (c) applies this limitation to a period of custody in county jail. In imposing sentence, the trial court stated: "This offense is a violent felony pursuant to Penal Code section 667.5. Accordingly, you are entitled to 253 actual date [*sic*], plus an additional 37 days credit of good-time, work-time pursuant Penal Code section 2933.1(c)."

Section 667.5, subdivision (c), does not specifically list section 243, subdivision (d), as a violent felony. Subdivision (c)(8) of this section is a catch-all provision for "[a]ny felony in which the defendant inflicts great bodily injury on a person other than an accomplice which has been charged and proved as provided for in Section 12022.7 . . . ." Section 12022.7 provides sentence enhancements of varying lengths imposed on "any person who personally inflicts great bodily harm" in the commission of a felony or attempted felony in specified circumstances. (§ 12022.7, subds. (a)-(e).) Section 12022.7 does not apply, however, "if infliction of great bodily injury is an element of the offense." (*Id.*, subd. (g).) But this limitation in turn does not apply to subdivision (e) of

28

section 12022.7, which provides a sentence enhancement for "[a]ny person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony . . . ." (§ 12022.7, subd. (g).)

Defendant was convicted of battery with serious bodily harm (§ 243, subd. (d)), arguably under circumstances involving domestic violence, in that he was also convicted of battery of a former cohabitant (§ 273.5, subds. (a), (b)(2)).  However, a section 12022.7 enhancement was never charged, let alone proved against defendant.  Therefore, subdivision (c)(8) of section 667.5 by its terms does not apply.  Accordingly, the trial court had no basis to limit defendant's worktime credit.[7]

The Attorney General, however, argues that section 667.5, subdivision (c)(8) applies, relying on *People v. Hawkins* (2003) 108 Cal.App.4th 527 (*Hawkins*).  Hawkins was convicted of battery with serious bodily injury (§ 243, subd. (d)), after punching a fellow patient in the face in a drug rehabilitation facility.  (*Hawkins*, at pp. 529-530.)  The prosecution alleged Hawkins personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), but that allegation was not submitted to the jury and the prosecution subsequently struck it.  (*Hawkins*, at p. 530.)  In calculating Hawkins' presentence credit, the trial court applied section 2933.1.  (*Hawkins*, at p. 530.)  On appeal, the Attorney General argued "Hawkins' crime was 'charged and proved as provided for in Section 12022.7' because a section 12022.7 enhancement allegation was charged in the information, and the 'great bodily injury' contemplated by that section was proved when the jury found him guilty of inflicting serious bodily injury under section 243, subdivision (d)." (*Ibid.*)

---

[7] Defendant did not object to the court's sentence limiting worktime credit.  However, " '[a] sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered.' " (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 235.)

29

The version of section 12022.7 in effect at the time of Hawkins' sentence included the same exception as the current version for a felony where "great bodily injury" is an element of the underlying crime, as well as the exception to the exception for domestic violence. (*Hawkins, supra*, 108 Cal.App.4th at p. 531.) The *Hawkins* court reasoned: "Because the 'great bodily injury' contemplated by section 12022.7 is substantially the same as the 'serious bodily injury' element of section 243, subdivision (d) [citation], the section 12022.7 enhancement cannot be applied to the crime of battery with serious bodily injury unless it involves domestic violence." (*Ibid.*)

On reply, defendant argues that in this case a section 12022.7 enhancement was never charged and "[t]he legislature has specifically imposed a pleading and proof requirement in section 667.5, subdivision (c)(8). The prosecution failed to comply with this requirement. Therefore, the court erred in finding this was a 'violent felony.' " *Hawkins* is not to the contrary. The court in that case concluded "that battery with serious bodily injury cannot qualify as a violent felony under section 667.5, subdivision (c)(8), *even if it includes a great bodily injury allegation under section 12022.7*, unless the crime was committed under circumstances involving domestic violence." (*Hawkins, supra*, 108 Cal.App.4th at p. 531.) In short, absent circumstances involving domestic violence, a section 12022.7 enhancement could never be applied to section 243, subdivision (d), even if the allegation was charged and proved as required by section 667.5, subdivision (c)(8).

The Attorney General's response is that it is sufficient to plead and prove the conduct amounting to personal infliction of great bodily injury under domestic violence circumstances, citing *People v. Johnson* (2016) 244 Cal.App.4th 384 (*Johnson II*). In *Johnson II*, the court held that "the prosecution is not required to plead and prove personal infliction of great bodily injury as a separate enhancement for the conviction to be classified as a 'serious felony' within the meaning of section 1192.7, subdivision

(c)(8). [Citations.] Instead, it is sufficient if such *conduct* has been pled and proven." (*Id.* at pp. 389-390.)

However, *Johnson II* drew a distinction between a violent felony under section 667.5, subdivision (c)(8) and a serious felony under section 1192.7, subdivision (c)(8). The court said: "Section 667.5, subdivision (c)(8) defines as a violent felony '[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice which has been charged and proved as provided for in Section 12022.7 . . . .' Here, enhancements under section 12022.7 were alleged in conjunction with counts three and four, but, because the jury acquitted defendant of those counts, the allegations cannot be deemed to have been proven. Accordingly, defendant's current convictions do not constitute violent felonies within the meaning of section 667.5, subdivision (c). [¶] Section 1192.7, subdivision (c)(8) does not contain the same specific pleading and proof requirement. That statute defines as a serious felony 'any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice . . . .' Although this language corresponds to the language of section 12022.7 [citations], the prosecution is not required to plead and prove personal infliction of great bodily injury as a separate enhancement for the conviction to be classified as a 'serious felony within the meaning of section 1192.7, subdivision (c)(8)." (*Johnson II, supra*, 244 Cal.App.4th at pp. 389-390.)

In *Hawkins*, the court also noted the distinction the Legislature made between a violent felony under section 667.5, subdivision (c)(8) and a serious felony under section 1192.7, subdivision (c)(8). (*Hawkins, supra*, 108 Cal.App.4th at pp. 531-532.) The court then held that "[s]ection 2933.1's 15 percent custody credit limitation only applies to those crimes defined as violent felonies under section 667.5." (*Id.* at p. 532.)

For these reasons, we conclude that the trial court erred in restricting defendant's worktime credit under section 2933.1.

V

31

*Assembly Bill No. 518 and Senate Bill No. 567*

We granted defendant's request for supplemental briefing on Assembly Bill No. 518 (2021-2022 Reg. Sess.) and Senate Bill No. 567 (2021-2022 Reg. Sess.), both effective on January 1, 2022.  Defendant contends the laws adopted by these bills apply retroactively and this case should be remanded for resentencing accordance with the new legislation.

Under section 654, a defendant who violates multiple laws in a single course of action may be charged with and convicted of distinct crimes but sentenced for only one offense; sentence on the other offenses is imposed, but stayed.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 673 (*Sek*); *People v. Mendoza* (2022) 74 Cal.App.5th 843, 862.)  Former section 654 required the trial court to impose sentence based on the offense with the longest prison term.  (*Mendoza*, at p. 862; *Sek*, at p. 673.)  Assembly Bill No. 518 (Stats. 2021, ch. 441, §1) amended section 654 to "remove[ ] the requirement to impose the longest term" (*Sek*, at p. 673) in order "to give trial courts discretion in selecting the punished offense for conduct punishable under multiple provisions of law."  (*Mendoza*, at pp. 861-862.)  Section 654, subdivision (a) now provides:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  Here, the trial court sentenced defendant under former section 654 to the upper term of four years doubled to eight years on count two, a felony (§ 273.6) and stayed sentence on count one, a misdemeanor (one year, § 240), count three, a felony (eight years, § 243, subd. (d)), and count four, a misdemeanor (one year, § 166, subd. (c)(1)).  Defendant seeks remand under Assembly Bill No. 518 presumably to urge the trial court to exercise its discretion under the new legislation to impose a sentence on one of the misdemeanor counts.

Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) also changed the sentencing court's discretion, not by expanding but rather limiting the court's discretion.  "Senate

Bill No. 567 amended section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*); § 1170, subd. (b)(1) & (2).) "Under this change in law, a trial court 'may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' " (*Flores*, at 1038, fn. 10, quoting § 1170, subd. (b)(2).)

The Attorney General concedes that Assembly Bill No. 518 and Senate Bill No. 567 apply retroactively to defendant's appeal, and we agree. (*In re Estrada* (1965) 63 Cal.2d 740, 745; *Sek, supra*, 74 Cal.App.5th at p. 673 [under the principles of *Estrada*, Assem. Bill No. 518 applies "retroactively to defendants . . . whose convictions were not yet final when the law became effective January 1, 2022"]; *Flores, supra*, 73 Cal.App.5th at p. 1039 ["The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal"].)

Defendant appears to contend that if Assembly No. 518 and Senate Bill No. 567 are retroactive, remand is required. The Attorney General argues remand is not appropriate under Assembly Bill No. 518, because the trial court would not have exercised its discretion to impose sentence on one of the misdemeanor counts and stay the sentence on the felony counts. As for Senate Bill No. 567, the Attorney General argues that remand is unnecessary because the trial court relied on defendant's criminal history, and, if there was error, it was harmless.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of

the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

The Attorney General correctly points out that section 1170, subdivision (b)(3), added by Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3), provides that the court may consider certified records of the defendant's prior convictions in determining sentencing without submitting the prior convictions to the jury. Here, the trial found true that defendant suffered prior convictions for purposes of (1) multiplying the term of his imprisonment under the three strikes law and (2) application of the five-year enhancement for a prior serious felony conviction under section 667, subdivision (a)(1). The court denied defendant's motion to dismiss all prior strikes under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, but granted his motion to strike the enhancement. There is no indication in the record that the court relied on defendant's prior convictions for any other purpose, including in imposing the upper term on count two for violation of section 273.6. The court stated that its intention to impose the upper term without any discussion of aggravating factors that defendant admitted or were found true beyond a reasonable doubt. Therefore, we must remand this case for the court to sentence defendant in accordance with Senate Bill No. 567.

Because we remand this case for resentencing, the trial court may reconsider all prior sentencing decisions as to all counts under the statutes that exist at the time of resentencing, including under section 1170, subdivision (b), added by Senate Bill No. 567 and section 654 as amended by Assembly Bill No. 518. (See *People v. Buycks* (2018)

5 Cal.5th 857, 893; *People v. Walker* (2021) 67 Cal.App.5th 198, 201, 204.)  We express no opinion as to how the trial court should exercise its discretion on remand.

## DISPOSITION

This matter is remanded to the trial court for a full resentencing in accordance with this opinion, including our conclusion that section 2933.1 does not apply, as well as the legislative changes made by Senate Bill No. 567 and Assembly Bill No. 518.  The judgment is otherwise affirmed.

/s/
RAYE, P. J.

We concur:

/s/
HULL, J.

/s/
KRAUSE, J.

35